IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,<br>
Plaintiff,<br>
vs.<br>
**ADAM MANN**,<br>
Defendant.

No. 22-CR-1322-JCH

**THE UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

The United States is in receipt of defendant Adam Mann ("Defendant")'s motion to suppress evidence, Doc. 40. The United States respectfully opposes the motion. The Court could deny Defendant's motion for several reasons: he unequivocally abandoned the seized firearms by his conduct, the fire department personnel who found the firearms were entitled to be in his residence to resolve the fire emergency he created, Albuquerque Police Department was entitled to seize the abandoned firearms in their role as community caretakers, Defendant has not challenged the federal warrant retroactively authorizing the seizure, and Defendant has failed to establish any nexus between the challenged seizure and his later knowing and voluntary waiver of his *Miranda* rights.

I. Factual Background.

If this matter were to proceed to a hearing, the United States expects it would adduce evidence of the following facts:

1. In 2007, Defendant pled guilty to possessing with intent to distribute at least 5 grams of crack cocaine, as well as carrying a firearm during and in relation to a drug

trafficking crime, and possessing a firearm as an addict or unlawful user of a controlled substance, in federal court in case 07-CR-038. In 2009, Judge Hansen sentenced Defendant to 147 months in prison, but his sentence was later reduced to 120 months in 2013 when the crack cocaine guidelines were changed and retroactive application was allowed.

2. In 2009, Defendant was also convicted of trafficking in a controlled substance in New Mexico state court in case D-202-CR-2007-01766.

3. In 2022, Defendant was a member of the Brew Town Locos ("BTL"), also known as the Brew Town Spider Locos, a violent street gang based in the North Valley of Albuquerque[1]. Because of his membership in BTL, and because of his ongoing drug trafficking behavior and association with other dangerous members of the Albuquerque drug trafficking community, Defendant had the attention of FBI Special Agent ("SA") Jordan Spaeth, a member of the FBI's Violent Gang Task Force ("VGTF"). Defendant later told SA Spaeth that he had been born into the BTL, and that it was a small part of his life, despite his gang-related tattoos.

4. On or about May 31, 2022, Defendant appeared on security cameras at 3310 Shepard Place Northeast in Albuquerque, kicking the door, demanding vehicles, and holding two handguns. That house was quite near Defendant's own residence at 3314 Shepard Place Northeast, which appeared at the time to have bullet holes from a drive-by shooting[2]. FBI agents also observed bullet holes in the driver's side of Defendant's white GMC pickup truck.

---

[1] Albuquerque Gangland Episode 10 - Brew Town Locos:
https://www.youtube.com/watch?v=wejSbtmHXDs
[2] SA Spaeth later observed on surveillance camera footage the drive-by shooting that caused the holes in Defendant's house and truck. That shooting occurred in approximately April of 2022.

5. 3314 Shepard Place NE is located just southeast of the intersection of Carlisle Blvd. NE and Comanche Rd. NE in Albuquerque. It is only a few meters from Grisham Park, and it is within a few hundred meters (less than a quarter mile) from McKinley Middle School, Hogdin Elementary School, and Bel-Air Elementary School.

6. On June 4, 2022, Defendant started a fire (accidentally) at his house, and fled the house so as not to come in contact with city employees. FBI Agents later observed video of the June 4 house fire, showing someone who appeared to be Defendant leaving the residence and walking a short distance away, waiting and watching from the treeline. Shortly thereafter, smoke was observed coming from Defendant's residence, and Albuquerque Fire and Rescue ("AFR") arrived. From the video, it appears Defendant left the area on foot as AFR arrived. AFR found the front door unlocked. In addition to the front door being unlocked, several windows in the house were broken, leaving the house further unsecured. Additionally, it appeared the white GMC pickup truck in the driveway appeared to be inoperable.

7. After AFR successfully fought the house fire, they called arson investigators to determine the cause of the fire.

8. AFR firefighters, immediately after putting out the fire in the kitchen, noticed two unsecured handguns on the kitchen counter (not in a drawer, but rather in plain view) at the residence. Because the nobody was home, and they could not simply leave unsecured firearms and ammunition in an unsecured house in a residential neighborhood near a park and three schools, AFR called the Albuquerque Police Department ("APD"), who sent not a detective but a Police Service Aide ("PSA") to collect the firearms and ammunition for safekeeping. The PSA picked up the firearms

and ammunition only (from where they were on the floor of the kitchen when the PSA showed up), and did not search the house to look for anything else. When the PSA showed up to seize the firearms and ammunition for safekeeping, the fire investigators were still in the middle of their immediate fire-response activities[3].

9. On June 15, 2022, SA Spaeth sought a warrant not only to obtain the firearms from APD, but to authorize *nunc pro tunc* the original seizure of the firearms from Defendant's residence, writing "I believe the APD did not obtain a warrant to seize the firearms and am requesting this court retroactively permit the seizure of the two firearms." Doc. 40-4 p. 2 n. 1. In that application, SA Spaeth faithfully set forth the circumstances under which the firearms were originally seized for safekeeping by the APD PSA. SA Spaeth also sought authority to take DNA swabs of Defendant potentially to compare to the firearms seized from Defendant's house. United States Magistrate Judge Jerry Ritter issued the warrant.

10. SA Spaeth caught up with Defendant on July 15, 2022. It had taken some time to find Defendant because he had been avoiding his own house to evade law enforcement. On July 11, 2022, however, VGTF agents observed Defendant at 6408 Karlson Drive NE in Albuquerque and obtained a follow-on warrant from United States Magistrate Judge Steven Yarbrough to arrest him there. SA Spaeth arrested Defendant at 6408 Karlson Drive NE and served the warrant authorization to take DNA swabs (though the FBI lab was not able to recover DNA from the pistols that could be compared).

11. At that location, after receiving written and verbal consent to search from Defendant's mother, the FBI recovered approximately $300,000 in partially-burned U.S. Currency

[3] The PSA showed up at 11:39 a.m., after being called to the scene by fire responders at approximately 10:45 a.m., and the fire responders were on-scene until 1:46 p.m.

in $50 and $100 denominations, a brown powder that field-tested positive for heroin, and the blue Polaris Razor off-road vehicle with which Defendant had been spotted several times previously. Defendant also admitted knowing he was a felon who had spent time in federal prison. Defendant was upset when he learned that he had been captured on camera holding two pistols during the May 31, 2022 door-kicking incident.

12. FBI fingerprint analysis revealed that Defendant's fingerprints were on the magazines for both pistols.

II. Defendant abandoned the pistols.

Defendant lacks standing to challenge the seizure of the pistols charged in this case because he unequivocally abandoned those pistols by his conduct. The burden is on the United States to show that Defendant lacks standing to contest the seizure of the pistols because he abandoned them. *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006). The government's burden is to make that showing by a preponderance of the evidence. *U.S. v. Denny*, 441 F.3d at 1226 (*citing United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003)). Defendant will only be found to have abandoned the pistols if he either "(1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment." *United States v. Garzon*, 119 F.3d 1446, 1452 (10th Cir. 1997). There is no explicit disclaimer here, so the Court's only requirement to determine standing is to decide if he "unambiguously engaged in physical conduct that constituted abandonment." *Garzon*, 119 F.3d at 1452.

Here, Defendant knew there was a fire because he started it. Rather than waiting for the fire department to arrive so he could guide them to the source of the fire and thereby assist their efforts to defeat it swiftly and safely, he fled the house to wait and watch from a nearby concealed position. When city employees showed up, even though they were not police, he fled the area with

the front door unlocked. His reason for doing so is simple to understand: he knew he was a felon, did not know he had already been caught on camera holding those pistols, and did not want to be associated with the pistols or get in trouble for possessing them. It was likely for the same reason that Defendant avoided the house for the following weeks, returning only at night to retrieve items like the partially-burned US Currency of more than $300,000. This was so even thought the front door was unlocked and many of the windows had been shot out, either from the inside or from the drive-by shooting performed on the house from the outside.

The Court could also find that Defendant abandoned the residence more generally. In *United States v. Manning*, the Fifth Circuit found a rented house to have been abandoned when Manning left the rented house, the door was unlocked, food was on the table, and weeks later the decayed food created a stench, the grass was uncut, and the weeds had grown high. 440 F.2d 1105, 1111 (5th Cir. 1971) (*citing Abel v. United States*, 362 U.S. 217 (1960)). In *United States v. Ferguson*, the Ninth Circuit found that Mr. Ferguson had abandoned the residence in question when he "told aid personnel that the house was not his…. also produced identification which listed his address as being in another city, and … when released by police, [] got into his car and drove away." 33 Fed. App'x 849, 850 (9th Cir. 2002) (unpublished). Here, Defendant's physical conduct similarly signals abandonment. Here, Defendant similarly avoided his house, and did not repair the windows, or the fire and water damage in the kitchen, for the six or so weeks between the fire and when the FBI found him hiding out at his mother's house.

The Court need not find that Defendant abandoned the entire house, however, to find that he abandoned the pistols specifically and did not want to be associated with them or caught with them. That is enough to find that he lacks standing to challenge the seizure of those pistols.

III. Albuquerque Fire Personnel and the Police Service Aid Had a Valid Community Caretaking Purpose in Seizing the Pistols.

a. Albuquerque Fire Personnel Did Not Need a Warrant to Enter and Remain in Defendant's Residence For a Short Time.

After Defendant started a fire at his residence, and then fled the scene, Albuquerque Fire personnel were entitled to fight the fire and conduct their normal fire-related investigation to determine its cause. It was during that fire-related activity that fire-fighting personnel found the two challenged pistols out on the kitchen counter in Defendant's house. With no residents or neighbors there to secure the firearms, and with the open and burned house within a residential neighborhood and near a park and three schools, it was wise and proper for the fire department to call an APD PSA to take the pistols for safekeeping.

Defendant now complains that the fire-fighting activity at his residence was an arbitrary invasion of his privacy and security by government officials. Doc. 40, p. 4 (*citing Michigan v. Tyler*, 436 U.S. 499, 504 (1978)). It was anything but. In *Tyler*, firefighters extinguished a fire at a furniture store, left, and later came back more than once without a warrant for the purpose of investigating crimes. *Tyler*, 436 U.S. at 501-03. The Supreme Court held that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry reasonable… [a]nd once in a building for this purpose, firefighters may seize evidence [] that is in plain view." *Id*. at 509. The Supreme Court went on to hold that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of the blaze after it has been extinguished [and] warrantless seizure of evidence while inspecting the premises for these purposes is also constitutional." *Id*. at 510. It was the subsequent re-entry of the burned building by fire investigators days after the fire had been extinguished and the original fire-based exigency resolved that required a warrant. *Id*. at 511. The Supreme Court summarized its analysis by holding

that "an entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." *Id*.

Here, there is no allegation that fire investigators re-entered Defendant's home after leaving. Instead, all available evidence suggests that the challenged pistols were found by fire-fighting personnel or fire investigators immediately after the fire was fought, in the same visit required by the need to fight the fire itself. According to the law as found by the Supreme Court in *Tyler*, none of that activity required a warrant. Neither *Tyler* nor subsequent case law regarding administrative searches helps Defendant. *See Michigan v. Clifford*, 464 U.S. 287 (1984) (warrant required for arson investigators to return a half-day after fire-fighting was complete and to continue searching for evidence upstairs after the cause and origin of the fire was found in the basement).

b. The Albuquerque Police Department did not Need a Warrant to Seize the Unsecured Firearms for Safekeeping.

Defendant's complaints that APD needed a warrant to seize the firearms Defendant had abandoned and left unsecured are meritless because APD had a valid community caretaking purpose in doing so. Defendant states "The only reason the Fire Department reached out to the police department was to obtain information of a crime." Doc. 40, p. 8. That is untrue. AFR had no reason to believe that possessing the two pistols in question was a crime at all, because they did not know or care about Defendant's status as a previously-convicted felon. Defendant also states "There was no concern that the firearms were going to be destroyed or otherwise disappear from the scene in the short amount of time it would take to obtain a warrant." *Id*. That is also untrue. The unsecured firearms were in a home with an unlocked door, with several shot-out windows, in the middle of a busy residential neighborhood near a park and three schools. Defendant also states

"The only purpose served by the Public Service Aid [sic] seizing the firearms was to gather evidence of possible criminal activity to further a potential criminal prosecution." *Id*. at 9. That, too, is untrue. APD has crime scene technicians and detectives to investigate crime and collect forensic evidence for prosecution; PSAs do not do that when property is found, but rather pick up found items, complete a Uniform Incident Report, and make reasonable efforts to contact the rightful owner of found property. Exhibit 1 (Albuquerque Police Department General Order 1-78: Police Service Aide Program), p. 7. Here, there were no dangerous items that needed to be secured other than the pistols, magazines, and ammunition, so that is all the PSA took for safekeeping.

When Defendant set his house on fire and left it unsecured, with firearms unsecured out in the open on a kitchen counter rather than safely stored within it, it was the middle of a Saturday morning in the middle of a residential neighborhood next to a park and within a quarter mile of three schools. The official AFR report describing the incident makes explicit the connection between the firearms being unsecured, with nobody there to safeguard them, and AFR referring the existence of the firearms to APD, thus: "Multiple areas of gunshot damage were found to the home and vehicles parked there, several unsecured firearms were also found in the home with no one home, this was reported to APD." Doc. 40-2, p. 13. Because of those specific facts and circumstances, APD was wise and reasonable to collect the firearms for safekeeping.

In *United States v. Trujillo*, a district court suppressed firearms seized without a warrant from a vehicle parked in public whose driver was being arrested, but the Tenth Circuit reversed because police were entitled to "protect the public from the possibility that a [firearm] would fall into untrained or perhaps malicious hands." 993 F.3d 859, 868 (10th Cir. 2021) (*quoting Cady v. Dombrowski*, 413 U.S. 433, 443 (1973)). The Tenth Circuit described how the Supreme Court "rejected the argument that law enforcement's actions were unreasonable because the gun could

have conceivably been secured by other means." *Id*. at 868-69. Similarly, Defendant's arguments now that APD could have conceivably done something more difficult or less intrusive (Doc. 40 p. 8) are meritless; the question is not whether police could have zigged rather than zagged, but whether their actions were reasonable under the Constitution. "The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means." *Trujillo*, 993 F.3d at 870 (internal citations omitted).

The Court can also compare and contrast the unsecured firearms in Defendant's unsecured house in a busy residential neighborhood at 11 a.m. on a Saturday morning with the circumstances presented in *United States v. Chavez*, in which the Tenth Circuit reversed the denial of a motion to suppress evidence resulting from the warrantless search of a car legally parked at the isolated end of a private road. 985 F.3d 1234 (10th Cir. 2021). The Tenth Circuit made that decision after assessing whether the government could present specific and articulable facts to establish whether 1) the firearm was in a public spot readily accessible to children, vandals, or thieves, 2) whether the firearm was in a secluded or a busy location, and 3) whether a person other than the person arguably being investigated was available to secure the firearm. *Chavez*, 985 F.3d 1244-45. Just as all those factors cut in favor of Mr. Chavez in his case, they now cut against Defendant here.

Because AFR was acting within the law when they discovered the unsecured firearms during the immediate emergency call for fire-fighting services, and because APD was acting as a community caretaker when it seized those firearms for non-prosecution purposes, the Court should deny the suppression Defendant now requests.

## IV. Defendant Has Forfeited Argument Against Judge Ritter's Warrant.

Upon learning of the June 4, 2022 fire and firearm discovery, before taking any law enforcement action to search or seize anything, SA Jordan Spaeth of the FBI applied for a warrant

from the on-duty magistrate, United States Magistrate Judge Jerry Ritter. Doc. 40-4. In that warrant application, SA Spaeth faithfully set forth the facts supporting probable cause to believe the firearms could be evidence of a crime (because of Defendant's prior felony convictions). *Id*. He also truthfully explained the circumstances in which APD seized the firearms in question, and asked the court "retroactively permit the seizure of the two firearms." *Id*. at p. 2 n. 1; *see also id*. at p. 7 n. 2.

Judge Ritter granted SA Spaeth the requested search and seizure authority. Defendant has not challenged that warrant, or the probable cause supporting it, or SA Spaeth's good faith in executing it. Doc. 40. Defendant has therefore forfeited any argument that the warrant was invalid, or had an insufficient basis, or that SA Spaeth somehow failed to execute it in good faith. *See United States v. Elliott*, 684 F. App'x 685, 687 (10th Cir. 2017) ("Forfeiture occurs when [movant] fails to timely and adequately present the argument in district court."). Defendant's failure to challenge the validity of Judge Ritter's warrant, and SA Spaeth's good faith in executing it, are additional reasons to deny the instant motion to suppress.

## V. Defendant's Requests to Suppress Voluntary Statements and Evidence Obtained Pursuant to a Subsequent Warrant are Conclusory and Meritless.

After setting forth general principles of the exclusionary rule, Defendant requests in a single paragraph that 1) all evidence obtained pursuant to a separate warrant authorized by United States Magistrate Judge Steven Yarbrough over a month after the fire, and 2) all of Defendant's voluntary, post-*Miranda* statements also given over a month after the fire, in addition to the forensic analysis of the seized firearms themselves. Defendant does not explain or seek to explain how the warrant granted by Judge Yarbrough is invalid, or allege that SA Spaeth did not serve it in good faith. Defendant does not explain or seek to explain how Defendant's post-*Miranda* statements were involuntary or how they were a result only of the physical seizure of his two

pistols (when the most serious admission he made concerned his surprise and upset that he had been caught on video on May 31, 2022, before the firearms were seized). Defendant's argument and analysis is so deficient in these respects as to be entirely absent, and therefore forfeited. *See Elliott*, 684 F. App'x at 687. Judge Yarbrough's warrant and Defendant's voluntary, post-*Miranda* statements are both independent sources of evidence, making that evidence admissible regardless of whether the Court overrules or sustains Defendant's challenge to the original seizure of the pistols. *See United States v. Forbes*, 528 F.3d 1273 (10th Cir. 2008).

VI. Seizure of the Pistols Was Inevitable.

The United States maintains its position that APD properly seized the two challenged pistols for non-investigatory, community caretaking reasons. If APD had had an investigatory or prosecution interest in those pistols, however, they inevitably would have been able to obtain a warrant to seize them (as SA Spaeth later did). As the Tenth Circuit explained in *United States v. Metts*:

> The inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Strieff*, 136 S.Ct. at 2061 (citing *Nix v. Williams*, 467 U.S. 431, 443-44, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)). "Although a search may violate the Fourth Amendment, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000). The burden of proof is on the prosecution to prove by "a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444. In addition, no requirement exist that the "independent investigation inevitably . . . [leading] to discovery of the evidence . . . was ongoing at the time of the illegal police conduct." *Souza*, 223 F.3d at 1203 (quoting *United States v. Larsen*, 127 F.3d 984, 986 (10th Cir. 1997)). In fact, the independent investigation may be "hypothetical" only in nature. *United States v. Tueller*, 349 F.3d 1239, 1244 (10th Cir. 2003).

748 Fed. Appx. 785, 789 (10th Cir. 2018) (unpublished). Here, there was no criminal investigation at the time of the original seizure; the PSA's motives were to care for the community and follow their "found property" guidelines, not to investigate a potential crime. But if there had been a

hypothetical investigation at the time, APD had access to the information that 1) a neighbor had recently reported Defendant holding the pistols while kicking his door, 2) Defendant was a felon and not allowed to possess the pistols, and 3) the pistols had been located in Defendant's house and no one else had claimed them or was around to claim them.

If, hypothetically, the PSA had simply secured the scene as Defendant now claims he would have preferred, APD would have been able to check to see if other law enforcement agencies were interested in Defendant or his pistols. If APD had made such an inquiry, meaning if APD had taken an investigatory approach to the pistols rather than merely securing the pistols for safekeeping, SA Spaeth or the VGTF Task Force Officers across numerous state and local police agencies would have received that inquiry, and SA Spaeth could have applied for his federal warrant sooner than when he actually sought it from Judge Ritter on June 15, 2022.

In summary, every hypothetical path the encounter with the pistols could have taken would inevitably have led to a warrant authorizing the seizure from Defendant's house, if APD had not simply seized the pistols for safekeeping as actually happened. That is an additional legal and proper basis to deny suppression.

VII. Conclusion.

For the above-stated reasons, the United States respectfully requests the Court deny Defendant's motion to suppress evidence at Doc. 40. The filing of this motion response in CM/ECF caused a copy to be served on Nicole Moss, Esq., and Kelly Golightley, Esq., counsel for Defendant.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed on July 18, 2023*

PAUL J. MYSLIWIEC  
Assistant U.S. Attorney  
P.O. Box 607  
Albuquerque, NM 87103  
(505) 346-7274